**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| STOCKHOLDERS OF SIGMA SPACE CORP. AS OF FEBRUARY 16, 2016, <br><br> *Plaintiffs*, <br><br> v. <br><br> LEICA GEOSYSTEMS, INC., and HEXAGON AB, <br><br> *Defendants*. | **Civil Action File No:** <br> _____ |

## COMPLAINT

The Stockholders of Sigma Space Corporation as of February 16, 2016 ("Stockholders"), by and through counsel, assert the following claims against Leica Geosystems, Inc. and Hexagon AB (collectively, "Leica") under New York law for breach of contract, breach of implied duty of good faith and fair dealing, and for declaratory judgment.

## INTRODUCTION

1.     In the 2000s and early 2010s, Stockholders, a small group of scientists and innovators in suburban Maryland, developed a revolutionary airborne laser technology capable of providing terrain and elevation data with a speed and resolution that was substantially better than any other airborne sensor available. The high-resolution survey data generated with their technology dramatically improved the quality and speed of wide-area terrain mapping. The demonstrated market for these mapping services extended well into the billions of dollars.

2.     In early 2016, Stockholders sold Sigma Space Corporation to Leica pursuant to a Share Purchase Agreement ("SPA") for a price of up to $50 million. Ex. A, SPA § 2.2.1. Nearly

half of that compensation came in the form of earnouts, including an up to $15 million Data Services Business Earnout, which would be determined based on the data services revenue Leica received in calendar years 2016 through 2021.  Ex. A, SPA §§ 2.2.1, 2.4.

3.      Stockholders relied upon Leica's good faith and express agreement, consistent with the parties' negotiations, that it would account for the revenue it received from its possession of the Sigma Space sensor technology in the Data Services Business Earnout.

4.      Leica, unfortunately, did otherwise.   Leica has ignored its covenants and obligations in the SPA, using various tricks and corporate shell games to exclude and withhold revenue from the Data Services Business Earnout.  In particular, Leica failed to create the new, separate corporate entity that the SPA required, which enabled it to hide revenue across multiple corporate entities and made it far more difficult for Stockholders to trace.  Leica also concocted a baseless and unsupported interpretation of what revenue accrues towards the Data Services Business Earnout in order to exclude its most lucrative contracts from that earnout.   And throughout, Leica withheld – and continues to withhold – the very information needed to determine the correct amount of the Data Services Earnout owed under the SPA.

5.      Despite good faith attempts to resolve the dispute, Leica's breaches of its covenants and obligations under the SPA, as well as its breaches of its duties of good faith and fair dealing, have harmed, and will continue to harm, Stockholders by denying them the substantial Data Services Business Earnout payments they are owed, and will be owed, under the SPA.

## THE PARTIES

6.     Plaintiffs Stockholders are the holders of all of the outstanding shares of stock of Sigma Space Corporation ("Sigma Space"), a Maryland corporation, as of February 16, 2016. Exhibit B, which is Schedule 3.2.1 to the SPA, is a list of the individual Stockholders.

7.     The Stockholders appointed J. Marcos Sirota as the true and lawful agent and attorney-in-fact of the Stockholders ("Stockholders' Representative") to, among other things, act on behalf of the Stockholders in any litigation or arbitration involving the parties' SPA.  Ex. A, SPA § 2.7.1.  Mr. Sirota continues to serve as the Stockholders' Representative.

8.     Upon information and belief, Defendant Leica Geosystems, Inc. ("Leica Geosystems") is a company organized and existing under the laws of the State of Delaware with its principal business office at 5051 Peachtree Corners Cir., Suite 250, Norcross, GA 30092.  Leica Geosystems is in the business of, among other things, providing airborne laser sensors for terrain and elevation mapping projects worldwide, as well as related products.

9.     Upon information and belief, Defendant Hexagon AB is a company organized and existing under the laws of Sweden with a place of business in Stockholm, Sweden.  Upon information and belief, Hexagon AB is in the business of, among other things, providing design, measurement and visualization technologies worldwide, including without limitation through its wholly owned subsidiary Leica.

10.     Upon information and belief, Leica Geosystems is a wholly owned subsidiary of Hexagon AB and is controlled and/or dominated by Hexagon AB.  Upon information and belief, Leica Geosystems and Hexagon AB acted in concert regarding Leica Geosystems' performance

of the obligations set forth in the SPA, including without limitation the calculation and payment of the Data Services Business Earnout.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because:

       A.    Stockholders are individual citizens of Maryland and Virginia;

       B.    Leica Geosystems is a citizen, pursuant to 28 U.S.C. § 1332(c)(1) of the states of Georgia and Delaware;

       C.    Hexagon AB is a citizen, pursuant to 28 U.S.C. § 1332(c)(1) of the country of Sweden;

       D.    There is complete diversity of citizenship between the parties; *and*

       E.    The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.    This Court has jurisdiction over Defendant Leica Geosystems because, among other things, Leica Geosystems selected, and expressly and irrevocably consented to, exclusive jurisdiction in Fulton County, Georgia.  Ex. A, SPA § 10.13.  Furthermore, upon information and belief, Leica Geosystems has purposely availed itself of the rights and benefits of the laws of this jurisdiction by engaging in systematic and continuous contacts within this judicial District because it is a citizen of this judicial District, with its principal place of business at 5051 Peachtree Corners Cir., Suite 250, Norcross, GA 30092.

13.    This Court has jurisdiction over Defendant Hexagon AB because, upon information and belief, Hexagon AB has purposely availed itself of the rights and benefits of the laws of this

#3094731v1

jurisdiction by engaging in systematic and continuous contacts within this judicial District. Hexagon AB, upon information and belief, transacts business within this judicial District, including because it controls and acts in concert with Leica Geosystems, its wholly owned subsidiary. In particular, upon information and belief, Hexagon AB controls and acts in concert with Leica Geosystems with regard to the performance of the obligations set forth in the SPA generally, and the calculation and payment of the Data Services Business Earnout specifically. Furthermore, upon information and belief, Hexagon AB receives revenue from Leica Geosystems for its activities in this judicial District related to the obligations set forth in the SPA.

14.     Venue is proper in this judicial District because the parties agreed in the SPA that the venue for any legal proceeding or other legal action relating to the SPA shall be courts in Fulton County, Georgia, which falls within this judicial District and encompasses the Atlanta Division of this District. Ex. A, SPA § 10.13.

15.     Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), in that the acts giving rise to this suit and the conduct complained of herein occurred in substantial part in this judicial District, including without limitation through Leica's actions at its offices in this judicial District.

## FACTUAL ALLEGATIONS

## I.     Sigma Space's Sensor Technology

16.     Founded in the mid-1990s, Sigma Space was a state-of-the art technology development company, building "first of" instruments in collaboration with NASA scientists for aircraft and space-based science. Many of the technologies it developed involved airborne light detection and ranging ("LiDAR") systems – and in particular, airborne LiDARs used for large-scale terrain and elevation mapping by commercial and governmental customers around the world.

#3094731v1

17.     One of the most significant technologies Sigma Space developed was its Single-Photon LiDAR system ("SPL").  The SPL provided elevation data with a speed and resolution that was at least ten-times better than any other conventional airborne sensor.  The high-resolution survey data generated with Sigma Space's SPL technology dramatically improved the quality, speed and efficiency of wide-area terrain mapping.  By 2015, Sigma Space had performed numerous campaigns in Maryland, California, Florida and elsewhere to generate high-resolution data using the SPL technology, and to sell that data to customers.

18.     In 2015, Leica and Sigma Space began discussing a potential acquisition of Sigma Space by Leica.  Leica and the Stockholders ultimately executed the SPA, which became effective on February 16, 2016, whereby Leica Geosystems – and, indirectly, Hexagon AB – bought, and the Stockholders sold, all of the outstanding shares of Sigma Space Corporation.

19.     The SPA is a valid and enforceable contract.

## II.     The Stock Purchase Agreement

20.     Leica acquired Sigma Space Corp. for a total price of up to $50 million, some of which it paid at closing and some of which it was to pay through earnouts over subsequent years, contingent upon the performance of various Leica business units.

21.     At closing, Leica was to pay Stockholders a fixed amount in Closing Cash Consideration, with a portion held in escrow for 18 months, after which time the escrowed amount would be paid to Stockholders.  Ex. A, SPA § 2.2.1.

22.     Leica also was to pay up to $22 million through two separate earnouts – a Core Business Earnout and a Data Services Business Earnout – with the specific amounts of each dependent upon the performance of specific Leica business units.  Ex. A, SPA § 2.2.1.

#3094731v1

- 6 -

23.     The majority of the earnouts was to come through the Data Services Business Earnout.  While the Core Business Earnout amounted to a total potential earnout of $7 million based on the total revenue of Sigma Space's "core" business in calendar years 2016 through 2018, Ex. A, SPA § 2.3, the Data Services Business Earnout allowed a potential earnout of $15 million based on the data services revenue generated in connection with Sigma Space's sensor technology in calendar years 2016 through 2021.  Ex. A, SPA §§ 1.3, 2.4.

24.     The $15 million upper limit on the Data Services Business Earnout reflected the parties' understanding that there was substantial potential revenue to be earned through the use of Sigma Space's sensor technology.  Ex. A, SPA §§ 1.3, 2.4.  As just one example, around the time the parties executed the SPA, Stockholders expected that the U.S. Geological Survey ("USGS") would receive funding well in excess of $1 billion for survey work over the coming years, some (if not all) of which could be performed using Sigma Space's sensor technology.  Officials from Sigma Space had already had direct talks with the USGS prior to execution of the SPA regarding its expected role in the survey work, and its business goal was to capture some portion of that survey work.  The upper limit to the Data Services Earnout was included, in part, to keep the earnout amount in line with the parties' overall expectations about the total value of the transaction.

25.     The Data Services Earnout was an essential component of Stockholders' expectations in negotiating and ultimately agreeing to the SPA.  Stockholders knew the substantial potential demand for the Sigma Space sensor technology.  They could have demanded a fixed amount of additional Closing Cash Consideration; instead, they gave up that guaranteed payment in direct reliance on Leica fully and fairly calculating and paying the Data Services Earnout in good faith.  Had the Stockholders known or reasonably expected that Leica would not calculate or

#3094731v1

pay the Data Services Earnout fairly and in good faith according to the SPA, the Stockholders would not have agreed to such a compensation arrangement.

### III.   The Data Services Business Earnout

26.    The SPA defines how the Data Services Business Earnout is to be calculated. Specifically, the Stockholders "shall be entitled to an annual earnout payment . . . equal to five percent (5%) of the Data Services Business Revenue, if any, generated during calendar years 2016 through 2021," provided that the total Data Services Business Earnout payments do not exceed the $15,000,000 limit.  Ex. A, SPA §§ 2.2.1, 2.4.

27.    The Data Services Business Revenue, on which the Data Services Business Earnout depends, is defined simply in the SPA as "the revenue of the Data Services Business from sales to third party users, with any intercompany transfer pricing among Affiliates of [Leica] eliminated, calculated in accordance with Buyer's applicable accounting practices consistently applied." Ex. A, SPA § 1.3.

28.    The Data Services Business, whose revenue constitutes Data Services Business Revenue, is defined as the "data services business that [Leica] will establish in a new wholly owned subsidiary and operate using Sigma Space's sensor technology."  Ex. A, SPA § 1.3.

29.    The parties expressly agreed that Leica would create a "new wholly owned subsidiary" to "operate using Sigma Space's sensor technology" for good reason:  Placing all of the revenue derived from Sigma Space's sensor technology in a dedicated subsidiary would streamline the Data Services Revenue calculations and ensure Stockholders fairly received credit towards the Data Services Business Earnout for all of the revenue derived from Leica's possession of the Sigma Space sensor technology.  Because all of the revenue arising from Sigma Space's

sensor technology would flow into this new, separate entity, the bargained-for and agreed-to structure would prevent Leica from using corporate shell games to shield revenue from the Data Services Business Earnout, and would eliminate any ambiguity about what types of "data services" would be included in the Data Services Business Earnout calculations. Simply, the parties would need only to look at the total revenue received by this new single corporate entity to determine the amount of Data Services Business Revenue, and in turn, to determine the Data Services Business Earnout.

30.    There are no qualifications or limitations in the SPA on the revenue that constitutes Data Services Business Revenue; the plain text of Section 1.3 provides only that the Data Service Business's "sales to third party users" will accrue towards that amount. Ex. A, SPA § 1.3. There is no provision in Section 1.3, or anywhere else in the SPA, that limits the type or nature of the "sales to third party users" which accrue towards the Data Services Business Revenue. There is no provision in Section 1.3, or anywhere else in the SPA, that limits Data Services Business Revenue to only that revenue where Leica retains rights to, or can sell licenses to, data generated using the Sigma Space technology. And there is no provision in Section 1.3, or anywhere else in the SPA, that excludes from Data Services Business Revenue the sales to third party users related to the collection of data.

31.    The SPA, therefore, obligates Leica to count as Data Services Business Revenue all of the revenue it receives from the contracts involving sales of data or services where the Sigma Space sensor technology has been used.

32.    From the very outset, the parties understood and intended that the revenue associated with data services – and therefore, the revenue that would constitute Data Services

#3094731v1

Business Revenue and accrue towards the Data Services Business Earnout – would be broad.  In early May 2015, for example, the parties met in Zurich and expressly discussed the acquisition by Leica of what Sigma Space had called its "LiDAR Data on Demand" ("DoD") and "LiDAR Data as a Service" ("DaaS") business lines.  The DoD included revenue from direct sales and collection while the DaaS would include revenue from, among other things, potential subscriptions, licenses, and resales.  The parties' understood that both types of revenue would be part-and-parcel to the acquisition and Stockholders' compensation.

33.     Leica's initial offer to the Stockholders confirmed the parties' understanding that the Stockholders' compensation would be broad and include all forms of revenue.  On May 13, in its "first offer," Leica included the first iteration of the Data Services Business Earnout, which it tied to the "geospatial data business that is acquired with the first installment."  That data business expressly includes the DoD and DaaS, which was discussed only days earlier in Zurich.  Again, there was no limitation placed on the broad understanding of revenue previously discussed.

34.     The parties met again in Zurich in July 2015, and, in lieu of an earnout, discussed a potential 30% equity stake for Stockholders in the new data services business Leica would create around the Sigma Space technology.  While Leica later insisted that an equity structure was not possible because of its business structure, there was no disagreement as to the understanding that the revenue basis for the compensation was broad (because an equity stake would draw no distinction in the type of revenue that would come into the business).  Once more, there was no distinction at all in the type of revenue that would count towards Stockholders' compensation.

35.     In lieu of equity, in September 2015, Leica offered a formal proposal that proposed a 30% share of profits generated by the data services business.  Again, as with an equity stake,

#3094731v1

basing compensation on a share of profits includes all revenue sources arising from the Sigma Space technology.

36.    Finally, the parties ultimately agreed to the provisions in the SPA described above, which captured the parties' understanding that the types of revenue which would accrue towards the Data Services Business Earnout would be broad and include revenue from *all* sales, including among other things, sales associated with data collections, sales associated with licenses of data, sales associated with the re-sale of acquired data.

37.    Nonetheless, despite the plain text of the SPA and the parties' understandings, Leica has intentionally withheld from the Data Services Business Earnout substantial amounts of revenue derived from its possession of the Sigma Space sensor technology.

## IV.    Leica Has Breached the SPA

### A.    Leica Failed to Establish a New Data Services Business

38.    Leica has failed to perform its covenant and obligation to "establish" a "new wholly owned subsidiary" which would "operate using Sigma Space's sensor technology," and in doing so, it breached the SPA.  Ex. A, SPA § 1.3.

39.    Rather than establish the new subsidiary, upon information and belief, Hexagon AB and Leica Geosystems have generated and accumulated revenue from the operation of the Sigma Space sensor technology in multiple corporate entities.

40.    Leica has subsequently conceded in correspondence with Stockholders that it "decided not to set up a separate entity."

41.    The decision by Hexagon AB and Leica Geosystems to ignore the SPA and not to establish a new subsidiary for the Data Services Business has directly harmed the Stockholders.

#3094731v1

- 11 -

By not establishing a new corporate subsidiary, and instead generating and accumulating revenue from the Sigma Space sensor technology in multiple corporate entities, Hexagon AB and Leica Geosystems, upon information and belief, created a means to obscure the amount of Data Services Business Revenue they actually received and, in turn, to deprive Stockholders of the Data Services Business Earnout amounts owed to them under the SPA.

42.    Had Hexagon AB and Leica Geosystems established the Data Services Business required by the SPA, upon information and belief, Hexagon AB and Leica Geosystems would not have been able to use corporate shell games to obscure the source and amount of the revenue they have received as a consequence of their possession of the Sigma Space sensor technology.

**B.    Leica Is Improperly Excluding Revenue from the Data Services Business Earnout**

43.    Separate from its decision not to establish a new corporate entity, Leica also has decided unilaterally to ignore the SPA and to exclude revenue for various types of data services from the Data Services Business Revenue, carving out certain types of sales and revenue from its Data Services Business Earnouts.  The effect of Leica's actions is to exclude the revenue it receives from many of its most lucrative contracts from the Data Services Business Revenue, and thereby withhold it from Stockholders.  The direct effect of Leica's actions is to substantially reduce the amount of the Data Services Business Earnout that it will pay to the Stockholders.

44.    Upon information and belief, Leica's attempts to withhold revenue began shortly after it signed the SPA.  In August 2016, Leica drafted a self-serving memorandum in which Leica attempted to rewrite its obligations under the SPA, which upon information and belief, was designed to shield revenue from accruing to the Data Services Business Earnout.  Leica's unilateral

memorandum was neither signed nor agreed to by Stockholders, and did not change Leica's obligations under the SPA.

45.     Leica's scheme to withhold revenue from the Data Services Business Earnout became clear to Stockholders on May 12, 2020, when Leica provided Stockholders' Representative with the Data Services Business Earnout for calendar year 2019; the proposed earnout totaled $448.  Stockholders' Representative immediately recognized that that amount did not account for substantial revenue Leica received during 2019.  As one example, Stockholders' Representative noted that Leica omitted revenue from the "OMNR" contract in Ontario, Canada. The value of this project is substantial: upon information and belief, Leica or its affiliates will receive revenue from this contract that, over the course of the contract, would lead to an earnout of multiple millions of dollars.  Upon information and belief, Leica has other contracts for additional projects that will also generate revenue from the Sigma Space sensor technology and will also accrue towards the Data Services Business Revenue.

46.     The Stockholders therefore objected to the $448 Leica proposed for the 2019 Data Services Business Earnout on May 26, 2020.  Ex. C, Ltr. to Webb.

47.     On June 23, 2020, counsel in Hexagon's Group Legal Department responded that Leica was intentionally withholding revenue from the Data Services Business Revenue.  Counsel stated that Leica's position is that it "[does] not consider the OMNR work" or certain other projects to be Data Services Business Revenue because Leica "[does] not own the data/content nor can [they] resell it.  It is just service work with no data ownership/upside."  Ex. D, Email from C. Webb.  Leica has repeatedly affirmed their position in subsequent correspondence that the revenue received from contracts involving data collected using the Sigma Space sensor technology do not

#3094731v1

accrue towards Data Services Business Revenue unless Leica "owns" the data generated and can later "resell" that data to additional customers in the future.

48.     The SPA's broad definition of Data Services Business Revenue includes none of the limitations and qualifications that Leica is using to withhold revenue generated through the Sigma Space sensor technology.  There is no support in the SPA for the proposition that only when Leica "retain[s] rights to that data" and can "sell licenses in the future" does revenue accrue towards the Data Services Business Earnout.

49.     Moreover, the criteria that Leica is attempting to apply now is one that Leica itself has not applied in the past.  Upon information and belief, despite now refusing to include the substantial revenues it receives for data collection, Leica has, for other contracts, included revenue associated with data "acquisition" as Data Services Business Revenue, which is synonymous with data collection.

50.     Further, the SPA's structure obligating Leica to "establish" a "new wholly owned subsidiary" for the Data Services Business was put in place to avoid the very tactics that Leica is now using to withhold revenue from the Data Services Business Earnout.  The creation of a new subsidiary would ensure the revenue that Leica now seeks to exclude from the earnout would flow into the Data Services Business Revenue.   By establishing a new entity to receive the revenues associated with the Sigma Space sensor technology, the calculations for Data Services Business Revenue would be straightforward – it would include all of the new entity's revenue – and would prevent Leica from engaging in the exact types corporate shell games and revenue withholding that it has done and continues to do.

51.     The revenue associated with the OMNR project – as well as any other contracts for which Leica uses the Sigma Space sensor technology – falls within the revenue to be included as Data Services Business Revenue for inclusion in the Data Services Business Earnout.   Leica receives revenue from the sale of the data created through the use of Sigma Space's sensor technology from these projects when the customer (OMNR, for example) pays for its service, which is a sale of data to the customer, and which fits easily within the scope of what the parties intended and agreed to in the SPA.   When data created using Sigma Space's sensor technology are sold to customers, that revenue must be credited to the Data Services Business for purposes of the earnout calculation, which is precisely the case with the OMNR project.

52.     Upon information and belief, Leica had or has other contracts in addition to the OMNR contract which have accrued Data Services Business Revenue and which Leica has willfully excluded from the Data Services Business Earnout calculations.

53.     Stockholders have repeatedly explained to Leica its deficiencies in attributing revenue to the Data Services Business Revenue, including in letters from their Counsel dated July 16, 2020 and September 21, 2020.   Exs. E, F.   Leica has nonetheless refused to include these revenues in the amounts that it ascribes to the Data Services Business Revenue.

54.     Leica, in response to Stockholders' repeated letters, has made only one adjustment to its 2019 Data Services Business Earnout.   After Stockholders repeatedly pressed Leica to explain its calculations and include additional revenue in the Data Services Business Revenue, Leica identified a "correction," conceding that a portion of the revenue from a USGS contract should be included in the Data Services Business Earnout, and increased the Data Services Business Earnout for 2019 from $448 to $19,465.75.   Nonetheless, despite this substantial

#3094731v1

backtracking, Leica continues to refuse to identify and include as Data Services Business Revenue all of the revenue required by the SPA.

55.     For calendar years 2016 through 2018, upon information and belief, Leica withheld and did not provide to Stockholders all of its contracts which accrued revenue from the Sigma Space sensor technology, leaving Stockholders with an incomplete and skewed understanding of the total amount of Data Services Business Revenue Leica had received for each year.  Upon information and belief, Leica's scheme kept the Stockholders in the dark about the true amounts of revenue it actually received, making it impossible for Stockholders to determine the correct amount of the Data Services Business Earnout that they were owed.

56.     Once aware of Leica's gamesmanship regarding its disclosure of Data Services Business Revenue, Stockholders asked Leica for information regarding its contracts for the calendar years 2016 through 2018 in order to determine how Leica was construing and determining the Data Services Business Revenue to the Data Services Business Earnout in those years.  Leica has refused to provide any information for its contracts in years prior to 2019, stating that those years are "not at issue" and that there "is no basis for disputing earlier years."  Today, Stockholders still do not have a complete, accurate picture of the revenue Leica has earned through its possession of the Sigma Space sensor technology.

57.     Upon information and belief, Leica will continue to improperly withhold revenue from the Data Services Business Earnout for calendar years 2020 and 2021, just as it has done in calendar years 2016 through 2019, particularly because of the size of the lucrative contracts from which Leica will receive revenue in calendar years 2020 and 2021.

58.     Leica's decision to exclude revenues it has earned from the Sigma Space sensor technology from the Data Services Business Revenue is a breach of its obligations under the SPA that has directly harmed Stockholders.   Upon information and belief, Leica's distorted interpretation of the SPA has resulted, and will continue to result, in Data Services Business Earnout amounts that are far below the amounts that Stockholders are owed under the SPA.

59.     The SPA provides that "the sole recourse and exclusive remedy" for Stockholders against Leica for any dispute "arising out of" the SPA "shall be to assert a claim" under the Section 7.2 of the SPA.  Ex. A, SPA § 7.2.13.  The provisions require Leica to indemnify the Stockholders for "any breach by [Leica] of its covenants and obligations in or under" the SPA, without waiving any claim for "intentional misrepresentations, willful misconduct or fraud," or for "any equitable remedies" to which the Stockholders are entitled, Ex. A, SPA §§ 7.2.1(a)(ii), 7.2.13.

60.     Stockholders, through Counsel, provided notice to Leica of its direct claim on July 16, 2020, and reiterated their claim on September 21, 2020.  Exs. E, F.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

61.     Stockholders repeat and reallege each and every allegation in paragraphs 1 – 60 as set forth above, and incorporates them herein by reference.

62.     The SPA is a binding agreement between Stockholders and Leica Geosystems.

63.     At all times, Stockholders have performed, and remain ready, willing and able to perform, all of their obligations under the SPA, including any and all conditions precedent.

64.     Under the SPA, Leica covenanted and is obligated to "establish" a "new wholly owned subsidiary" which would "operate using Sigma Space's sensor technology."  Leica also

covenanted and is obligated to count as Data Services Business Revenue the "revenue of the Data Services Business from sales to third party users."  Leica therefore covenanted and is obligated to accrue as Data Services Business Revenue the revenue it receives from the contracts involving sales of data or services where the Sigma Space sensor technology has been used, and to apply such revenue to the Data Services Business Earnout.

65.     Leica has willfully breached its obligations under the SPA by (a) failing to establish a new wholly owned subsidiary which would operate using Sigma Space's sensor technology, and (b) by failing to count all of the revenue it receives from the contracts involving sales of data or services where the Sigma Space sensor technology has been used as Data Services Business Revenue for each of calendar years 2016 through the present.

66.     As a direct and proximate result of Leica's actions, Stockholders have sustained, and continue to sustain, injury and damages for which it is entitled to recover compensatory damages in such amount as the evidence may establish at trial.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

67.     Stockholders repeat and reallege each and every allegation in paragraphs 1 – 66 as set forth above, and incorporates them herein by reference.

68.     The SPA is a binding agreement between Stockholders and Leica Geosystems.

69.     Under the governing law, every contract, including the SPA, contains an implied covenant to deal with one another fairly and in good faith.

70.     At all times, Stockholders have performed, and remain ready, willing and able to perform, all of their obligations under the SPA, including any and all conditions precedent.

#3094731v1

71.     Leica's misconduct as alleged above constitutes a breach of the implied covenant of good faith and fair dealing in that Leica, through its actions, has deprived Stockholders of their right to receive the benefits of the SPA.   In particular, Leica has failed to count as Data Services Business Revenue all of the revenue received from contracts involving sales of data or services where the Sigma Space sensor technology is used.  It also has withheld from Stockholders the information necessary for Stockholders to assess the full and fair amount of the Data Services Business Revenue.   Through these actions, Leica violated the implied covenant to deal with Stockholders fairly and in good faith, and injured their right to receive the benefits of the SPA.

72.     As a direct and proximate result of Leica's actions, Stockholders have sustained, and continue to sustain, damages for which it is entitled to recover compensatory damages in such amount as the evidence may establish at trial.

### THIRD CAUSE OF ACTION
**Declaratory Judgment**

73.     Stockholders repeat and reallege each and every allegation in paragraphs 1 – 72 as set forth above, and incorporates them herein by reference.

74.     An actual, judiciable controversy currently exists between Stockholders, on the one hand, and Leica, on the other hand, in which legal issues are present, real, definite, and substantial, concerning Leica's obligations under the SPA, including with respect to the Data Services Business Earnout.  Stockholders rights with respect to the Data Services Business Earnout are directly and actually challenged by Leica's actions alleged herein.  The resolution of this judiciable controversy through a declaration of Stockholders rights will have a practical effect on the parties' actions and obligations.

#3094731v1

75.     Stockholders are entitled to a judgment declaring that:

A.      The revenue attributable to Data Services Business Revenue for calendar years 2016 through 2021 includes all of the revenue Leica receives from the contracts involving sales of data or services where the Sigma Space sensor technology has been used;

B.      Leica shall be in breach of the SPA should they fail to make the Data Services Business Earnout payments consistent with the above-described declaration of the revenue attributable to Data Services Business Revenue for calendar years 2016 through 2021.

## PRAYER FOR RELIEF

WHEREFORE, Stockholders pray for judgment against Hexagon as follows:

A.      Compensatory damages in excess of $1,000,000, in an amount according to the proof at trial;

B.      A declaratory judgment declaring the parties' rights and obligations as set forth herein; and

C.      Any and all other and further relief as the Court may deem just and proper.

#3094731v1

Dated:  November 3, 2020

/s/ Jason J. Carter
Jason J. Carter, Esq.
Georgia Bar No. 141669
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA  30309
Telephone:  (404) 881-4123
Facsimile:  (404) 881-4111
Email:  *carter@bmelaw.com*

OF COUNSEL:

Christopher J. Mandernach
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
Facsimile:   (202) 434-5029
Email: *cmandernach@wc.com*

**Attorneys for Plaintiffs**